IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ROY LYNN McDAVID, #01235555 | § | |
| VS. | § | CIVIL ACTION NO. 6:20cv579 |
| KIMBERLY THOMPSON, ET AL. | § | |

<u>REPORT AND RECOMMENDATION OF THE</u>
<u>UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Roy Lynn McDavid, a prisoner confined at the Connally Unit within the Texas Department of Criminal Justice (TDCJ), proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit complaining of alleged violations of his constitutional rights occurring at the Michael Unit. The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

The remaining claim in this lawsuit is McDavid's assertion that Defendant Thompson violated his constitutional rights by failing to protect him from serious harm. Both Plaintiff McDavid and Defendant Thompson filed motions for summary judgment, (Dkt. ##105, 107). For reasons explained below, the undersigned recommends that Defendant Thompson's motion for summary judgment be granted, Plaintiff McDavid's motion for summary judgment be denied, and that this case be dismissed with prejudice.

**I. McDavid's Amended Complaint**

McDavid's pleadings are not models of clarity. In sum, McDavid maintains that Thompson, Safe Prisons Officer, knew that he was in danger of being attacked by other prisoners— but failed to take steps to protect him, leading to a violent altercation between him and his cellmate on February 9, 2019. McDavid explains that he suffered serious injuries.

1

Specifically, McDavid argues that he explained to Thompson that he "felt unsafe," and had been "attacked" before. Thompson wanted him to sign a statement and "lock [him] up," which would have made him a "snitch." Even though he explained to her that he was unsafe and had been assaulted two times previously, "she cussed [him] out [and] forced [him] back in cell." Within one month, McDavid explains that he was assaulted by his cellmate and rushed to the Emergency Room with broken facial bones.

McDavid states that Thompson and the Warden acted with deliberate indifference to his claims of danger—and they knew he "was on G-III housing as a G-II [prisoner] with a known homophobic cellie" and within a housing area with a majority of gang members. He claims they took no action, as "a simple rehousing assignment could have and would have avoided [him[ being assaulted." He further notes that he "clearly ask[ed] to be housed with G-II offenders" and for safekeeping to no avail despite following due process by filing Step I and Step II grievances.

Moreover, after filing grievances in March 2019, number 2019090445, prison officials responded by stating that there was no evidence. McDavid insists that the Court examine his records from the emergency room. The Warden subsequently recommended that he be transferred, but the transfer was denied by the TDCJ State Classification committee (SCC). McDavid seeks placement in safekeeping and damages.

## II. McDavid's Motion for Summary Judgment

In his motion for summary judgment, (Dkt. #105), McDavid asserts that the State continues to delay in order to "build a false defense." He also argues that nothing justifies a crime under federal, criminal, or civil law. He contends that the State is manipulating the process or law and burdening him.

### III. Thompson's Motion for Summary Judgment

Thompson urges this Court to grant summary judgment in her favor and dismiss this lawsuit. Specifically, Thompson argues that she took all appropriate steps to investigate McDavid's grievances and protect his safety. She investigated his grievance by interviewing him on January 16, 2019—where McDavid explicitly stated that his life had not been threatened and clarified that the two assaults mentioned occurred in 2009 at the McConnell Unit. Thompson highlights that his concern was that, as a G-II prisoner, he did not want to be around G-III level prisoners. During the interview, McDavid wrote a statement stating: "My life is not at the present in danger but y'all are in violation of housing me with people who have no problem with murder," (Dkt. #107, pg. 3). McDavid became angry and returned to his cell after being informed that prisoners classified as G-II and G-III levels can be housed together.

When McDavid returned to the Michael Unit after receiving treatment at the emergency room, Thompson again interviewed him. An Offender Protection Investigation (OPI) was initiated, and Thompson interviewed the cellmate who assaulted McDavid. She subsequently interviewed McDavid for a third time—who refused to respond to his cellmate's version of events, and only commented that he was in danger because of G-III level prisoners and sought a single-cell assignment in safekeeping. Thompson interviewed two other prisoners in connection with this incident, reviewed McDavid's OPI records, and submitted her findings to the Unit Classification Committee (UCC) for review. After a UCC hearing on February 22, 2019, the Committee determined that there was not sufficient evidence to substantiate McDavid's claims of an on-going threat—but recommended that McDavid be transferred to a different unit. However, the SCC subsequently denied the transfer recommendation due to lack of evidence and released McDavid onto general population.

Thompson asserts that McDavid's claim is belied by the evidence, as McDavid's confinement prior to the assault did not pose a substantial risk of harm. After he was assaulted, she did not act with deliberate indifference because she reasonably responded—as her actions were indicative of legitimate concern for McDavid's safety. Finally, Thompson states that she is entitled to qualified immunity because McDavid failed to prove that she violated a clearly established constitutional right.

## IV. McDavid's Response

McDavid filed a response, (Dkt. #118), in opposition to Thompson's motion for summary judgment. He contends that Thompson is "vicious and callous." McDavid argues that he clearly told Thompson that he felt unsafe, and she offered no help at any time. He further maintains that his injuries are for no reason other than his sexual orientation, as he informed Thompson that he felt unsafe—and that she created the danger by placing him back in his cell.

He asserts that TDCJ is notorious for violating its own customs and policies. He highlights that he suffered serious injuries as a result of Thompson's "incompetence," as "she refused to act at all in anyway reasonable," which demonstrates that she maliciously and sadistically caused harm. McDavid argues that Thompson knew he was in danger, still denies his injuries, and did not speak to him when he returned from the hospital.

During the January 16, 2019 interview, Thompson refused to act and placed him back in his cell. He notes that he explained, in writing, to her that he felt unsafe—and that, subsequently "he stated due to her stupidity he felt unsafe to be fully or brutally honest," (Dkt. #118, pg. 3). After the return from the hospital, he further explains, Thompson did not interview him and that he "filed an OPI life endangerment because of her stupidity so she could not come near [him]." He claims that Thompson created the danger and did "absolutely nothing."

In response to Thompson's argument for qualified immunity, McDavid maintains that she violated clearly established law. She "did not act in anyway reasonable [through] complete utter incompetence and viscious [sic] disregard," which lead to him being seriously injured. McDavid insists that there was a "clear danger" and that it was "unlawful to not act." *Id*. at pg. 6.

## V. Summary Judgment Evidence

Defendant Thompson attached four exhibits to her motion for summary judgment:

> **Exhibit A: Excerpts of McDavid's TDCJ grievance records, bates numbered MCDAVID 0084-0120, with a business records affidavit;**
>
> **Exhibit B: Affidavit of Lorena McClintock (TDCJ Program Supervisor V), dated April 20, 2022, attaching the current version of TDCJ's "Safe Prisons/PREA Plan";**
>
> **Exhibit C: Affidavit of Susanna Douglas (TDCJ Program Supervisor V), dated April 19, 2022, attaching TDCJ Administrative Directive 04.17 and McDavid's TDCJ housing records; and**
>
> **Exhibit D: TDCJ Emergency Action Center records related to the February 9, 2019 altercation between McDavid and his cellmate, bates numbered McDavid 002-0056, with business records affidavit.**

McDavid attached many of the same records in a response, (Dkt. #101). He wrote notations in the margins of the documents, of which relevant portions will be discussed below.

<u>1. McDavid's Relevant Classification and Housing History</u>

The summary judgment evidence reflects that from October 5, 2018, until February 10, 2019, McDavid was housed at TDCJ's Michael Unit in 3 Building, C-Pod, 3 section, 1 row, cell 52, (Dkt. #107, pg. 123). During this time, McDavid was classified as a G-II custody level and had one cellmate who was also classified as a G-II custody prisoner. *Id*. Ms. Douglas, Program Supervisor V, explained TDCJ's procedures for classifying prisoners as follows:

> The custody level with the least amount of supervision is general population one (G1) custody, which refers to inmates who may live in dorms outside the security fence and may work outside the security fence with periodic unarmed supervision. All inmate trusties

(OT) are classified G1/OT custody. Inmates with general population two (G2) custody must live in dorms or cells inside the security fence and they may work outside the security fence, but only under direct, armed supervision. General population three (G3) custody level refers to inmate[s] who may live in dorms or cells inside the main building of the unit, inside the security fence. They are ineligible to live in dorms outside the main building. They may work outside the security fence under direct, armed supervision.

The difference between G2 custody and G3 custody is that G3 inmates are serving a longer sentence. They are both considered "minimum custody." Inmates assigned to General population four (G4) custody must live in a cell, with few exceptions, and may work outside the security fence under direct, armed supervision. General population five (G5) custody level applies to inmates who have exhibited assaultive or aggressive behavior; those inmates require direct supervision inside the security perimeter, and armed supervision on job assignments and activities outside. Finally, restrictive housing refers to inmates who must be separated from staff and other inmates because they are a threat to the physical safety of others or pose a threat to the order and security of the unit. More restrictive custody entails a more controlled housing assignment with more direct supervision and less opportunity for freedom of movement and programmatic and non-programmatic participation. Inmates who comply with the rules, including those who rehabilitate after an adverse disciplinary history, may be assigned to a less restrictive custody level.

(Dkt. #107, pg. 108-09). As highlighted, the summary judgment evidence reveals that at no time

McDavid was housed with a G-III prisoner at the Michael Unit. *Id*. at pg. 123.

### 2. McDavid's January 2019 Grievance and Investigation

On January 12, 2019, McDavid submitted a Step One grievance, number 2019063347, to

prison officials stating in relevant part:

This is not a LID or OPI housing issue. I recently wrote I-60 to Warden Kempt concerning the fact I'm housed on a [predominantly] G-III Bldg. with many offenders with agg[.] life & life without parole for homicide & sexual predator offenses.

I've got my time done seen parole once already & probably not far from goin home & I'd like to live & be in good health to do that, this is not a OPI it is a classification violation & it is out of control on Michael Unit. All I'm asking is to be moved off[f] this G-III Bldg. & wing & move me to 4 Bldg or dorms I know there is a waiting list for dorms I've been on it for a few months now.

Dkt. #107, pg. 20. McDavid further explained that he did not "feel comfortable or safe bein[g]

around G-III I've been attacked 2 times in years past" and that he could "sense when a housing

aera is unsafe." *Id.* at pg. 21. He specifically requested that prison officials move him to "4 Bldg with other G-II offenders or the dorms." *Id.*

Thompson interviewed McDavid on January 16, 2019, four days after he submitted the grievance, (Dkt. #107, pg. 27). During the interview, McDavid explained that his life had not been threatened and the previous attacks were in 2009. *Id.* at pg. 26. McDavid stated that he was going home soon and did not want to be housed among G-III offenders and murderers. He asserted that it was a violation for him—as a G-II prisoner—to be housed with G-III custody prisoners. *Id.* Thompson explained that G-II and G-III offenders can be housed together—at which point "McDavid became angry and returned to his current cell." *Id.* McDavid's written statement reads:

Attachment K

TEXAS DEPARTMENT OF CRIMINAL JUSTICE
SAFE PRISON/PREA PROGRAM
Offender Protection Witness Statement/Report of Interview

Page 1 of 1

Offender Name: Roy McDavid    TDCJ #: 123555    Unit: MT

Witness Name: _____    Title/TDCJ #: _____

Date of Interview/Statement: 01/14/2019    Time of Interview/Statement: 0945

Report Type:  ☑ Witness Statement    ☐ Report of Interview (check one)

My life is not at the present in danger but y'all are in violation housin me with people who have no problem with murder

Witness Printed Name: _____    Signature: _____    Date: 1-19-2019

Investigator's Printed Name: Kim Thompson    Signature: _____    Date: 1-19-2019

Dkt. #107, pg. 27. After the interview, Warden Meador responded to his Step One grievance on February 13, 2019. Warden Meador explained that his grievance was processed as an emergency, and highlighted that McDavid explained to the Safe Prisons Office during an interview that his life was not in danger. As a result, prison officials determined that "an offender protection investigation was not necessary." *Id.* at pg. 21.

       3. The February 9, 2019 Altercation and Investigation

On February 9, 2019, McDavid had an altercation with his cellmate wherein he suffered injuries. *Id.* at pg. 48. Emergency records reveal that McDavid was immediately sent to the local Emergency Room for an evaluation; the examination showed that he suffered multiple facial fractures.

McDavid returned to the Michael Unit from Hospital Galveston on February 15, 2019. *Id.* at pg. 49. Records indicate that Thompson conducted a standard PREA (Prison Rape Elimination Act) screening upon his return, (Dkt. #107, pg. 147). During this screening, McDavid stated that he wished to be placed in safekeeping and that this incident was the second time he was "beat up" by a cellmate. *Id.* He explained that he had been "attacked" before and was "shipped off" the Michael Unit in August 2009, and that "someone made a mistake" placing him back on the Michael Unit because the unit is unsafe. McDavid highlighted his January 2019 Step One grievance, asserting that he filed it for being "housed on 3 Bldg. with G-III & gang members" and that he felt unsafe. *Id.* McDavid recognized that he signed a statement declaring that his life was not presently in danger—but "felt unsafe with G-III & I also state now gang members." *Id.*

Thompson then interviewed McDavid's cellmate. The cellmate stated that McDavid was drunk and attempted to masturbate inside the cell. After telling him he was not going to, McDavid swung at him, fell due to being drunk, and struck the side of his face on the bottom bunk. *See* Dkt.

#107, pg. 149. The cellmate further asserted that "every time McDavid came at him [he] would push him down," and stated that he never struck McDavid. *Id.* Thompson then reinterviewed McDavid, who "refused to answer stating his life in in danger being housed with 'all these G3 murder[er]s and rapists" and needs single cell safekeeping." *Id.* Furthermore, as part of this investigation, Thompson interviewed two other prisoners—one of which heard the commotion inside the cell. *Id.* She completed her portion of the investigation on February 21, 2019, and forwarded her findings to the Uniformed Classification Committee (UCC). She forwarded the following information:

> McDavid has been incarcerated in TDCJ three times. The most recent incarceration starting on 6/4/2004. Due to Offender McDavid's history of inmate and staff assault, sexual misconduct and alcoholism, he was not placed in safekeeping upon his return to incarceration in 2004. McDavid is a while male, 5' 7'' tall, weighing 228 lbs. He is not small and weak. And as indicated by disciplinary reports, McDavid shows he can take care of himself in General Population.

> In conclusion there is evidence to support the allegations [of] violence. There is no evidence to support the allegations of threats of violence of gang members. No evidence can be found to indicate McDavid needs to be placed in safekeeping as he is requesting [. . .] A mental health referral (I-214) has been completed and turned in to Mental health.

> This OPI is being forwarded to UCC for their review and determination.

Dkt. #107, pg. 151.

On December 22, 2019, the UCC completed its review and recommendation. It determined that McDavid's claims of violence were substantiated but his claims regarding threats of violence were unsubstantiated. *Id.* at pg. 150. The Committee recommended a unit transfer and explained that his claim of violence was substantiated because of his injuries. On March 11, 2019, the State Classification Committee (SCC) denied the unit transfer—finding no evidence. *Id.* at pg. 36; 42. Moreover, the SCC noted that McDavid would remain in G-II custody and was to be released onto general population. *Id.* at pg. 42.

The summary judgment evidence illustrates that this—conducting interviews and reporting the findings—was the extent of Thompson's involvement in this case.

### 4. Additional Relevant Grievances and Additional Investigation

After McDavid submitted his Step Two grievance appeal in grievance number 2019063347, prison officials conducted another investigation.   In this Step Two grievance, McDavid explained that he "just got back from [the hospital] after being "beaten" by his cellmate resulting in broken facial bones. He states that he signed a statement indicating that "at present [he] was not in danger," but in his Step One grievance he "clearly said [he] did not feel safe" and that because he did not trust Thompson, he "could not be brutally honest," (Dkt. #107, pg. 18). However, McDavid noted, Thompson "put [him] back" in the cell. He claimed that he was in danger "here again" and requested placement in safekeeping. *Id*. at pg. 19.

The warden conducted an investigation based on these contentions, specifically McDavid's claims "that he was forced to state that his life was not in danger and when he returned to his cell, his cellie beat him up." *Id*. After conducting an investigation that included reviewing grievances, statements from officers, UCC and SCC records, the injury report, and documentation, the warden determined that McDavid's claims regarding Thompson were unsubstantiated. *Id*. at pg. 36; 54. On March 22, 2019, the warden explained that no further action would be taken. McDavid then initiated this federal lawsuit.

## VI. Legal Standards

A court shall grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  In determining whether there is a genuine dispute of a material fact, the court must examine the evidence and inferences drawn therefrom in the light most favorable

to the nonmoving party.  *See S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994).  Summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).

The United States Court of Appeals for the Fifth Circuit has held that summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions.  *See Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).  It is not the function of the trial judge—in ruling on a motion for summary judgment—to weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence.  *Id*. at 567 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

**VII. Discussion and Analysis**

A review of the summary judgment evidence, viewed in the light most favorable to McDavid, demonstrates that the evidence before the Court could not lead to different factual findings and conclusions. Summary judgment favoring Thompson is appropriate in this case.

1. Deliberate Indifference

McDavid contends that Thompson, as a Safe Prisons Officer, acted with deliberate indifference to his safety by failing to protect him from an assault at the Michael Unit. Specifically, McDavid maintains that he informed Thompson that he felt unsafe, but she "refused to act at all in anyway reasonable" when she returned him to his cell where he was later assaulted and received serious injuries.

The Eighth Amendment's prohibition against the imposition of cruel and unusual punishment requires prison officials to protect prisoners from violent attacks by other prisoners; however, not every injury suffered by a prisoner rises to the level of a constitutional violation.  *See*

*Horton v. Cockrell*, 70 F.3d 397, 400 (5th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).  The deliberate indifference standard is very difficult to meet.  *See Domino*, 239 at 756. The Supreme Court elaborated by holding that:

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of an disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that as substantial risk of serious harm exists, and he must also draw the inference. …
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38.  The Court further explained that prison officials who have actual knowledge of a risk of harm may not be held liable if "they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844-45 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").  Crucially, in order to show that prison officials were deliberately indifferent to a prisoner's need for protection, the prisoner must prove "that the official *actually knew* of a substantial risk of serious harm and *failed to act*."  *Adeleke v. Heaton*, 352 F. App'x 904, 907 (5th Cir. 2009) (per curiam) (unpublished) (emphasis added).

In this case, the summary judgment evidence reveals that the conditions of McDavid's confinement at the Michael Unit prior the February 9, 2019, altercation with his cellmate did not pose a substantial risk of harm. Specifically, the evidence shows that there is neither evidence that McDavid was at a substantial risk of harm before the assault nor evidence that Thompson knew he was at risk of a substantial risk of serious harm.

As Thompson notes, there is no concrete definition of what constitutes a "substantial risk of serious harm" under the Eighth Amendment. However, the United States Supreme Court has

explained that this component of a claim of failure to protect must be examined conceptually—with federal courts considering "whether society considers the risk . . . to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk." *Hudson v. McKinney*, 509 U.S. 25, 32 (1993). This Court has specifically held that vague allegations that a plaintiff was threatened and humiliated do not give rise to an inference of a substantial risk of harm. *See Carter v. Dawson*, 2007 WL 4290002, at *2 (E.D. Tex. Dec. 4, 2007).

Here, while McDavid explained in his grievance submitted prior to the assault that he had been "attacked" two times previously while within TDCJ, the summary judgment evidence reflects that those assaults occurred in 2009—ten years prior to the February 2019 assault—and at a different prison unit, (Dkt. #107, pg. 26).  Previous assaults occurring at the McConnell Unit do not translate to a substantial risk of harm at the Michael Unit years later. Moreover, McDavid's generalized fear of housing with G-III prisoners does not give rise to an inference that he was at risk of substantial harm. *See Coleman v. Tanner*, 2010 WL 2009445, at *9 (E.D. La. Apr. 27, 2010) (citing *Armstrong v. Price*, 190 F. App'x 350, 353 (5th Cir. 2006) (finding that a prison official was not deliberately indifferent wherein a plaintiff presented "rather vague information" about threats)). Both McDavid and his cellmate were G-II prisoners at the time of the assault, which further belies that his conditions of confinement at the Michael Unit prior to February 9, 2019, posed a substantial risk of harm.

Within his grievance prompting an investigation and his first interview with Thompson, McDavid offered no concrete, specific information regarding a threat of harm other than vague assertions that he "felt unsafe" and cannot be housed with G-III prisoners, (Dkt. #107, pg. 20). His vague assertions of potential harm undermine the notion that Thompson or prison officials knew McDavid was at a substantial risk of serious harm. *See Armstrong*, 190 F. App'x at 353 (holding

13

that "Armstrong failed to establish that, given the rather vague information he had provided them, it would be clear to a reasonable officer that such information presented a substantial risk of serious harm."); *Coleman v. Tanner*, 2010 WL 2009445, at *9 (E.D. La. April 27, 2010) ("A prison official's mere knowledge of vague threats against an inmate is not sufficient to make it clear to the official that such information presents a substantial risk of harm to the inmate.").

McDavid claims that Thompson "forced" him to write his statement. He offers nothing to support this claim. However, even if true, McDavid's initial grievance prompting the interview—wherein he claimed that his concerns were not "LID or OPI issue" and that he merely did not want to be housed with G-III prisoners—coupled with vague assertions of potential harm confirm that he was not at substantial risk of harm. Indeed, during the interview, McDavid again insisted that he not be housed with G-III prisoners, which illustrates nothing more than a generalized fear or vague threat. In other words, even without McDavid's written statement, he has failed to show that Thompson inferred that he was at a substantial risk of harm and that she disregarded that risk.

Additionally, contrary to McDavid's contentions, Thompson did act when he informed prison staff that he felt unsafe. Mere negligent failure to protect a prisoner from an assault is not a constitutional violation. *Stout v. LeBlanc*, 599 F. App'x 170, 171 (5th Cir. 2015) ("Mere negligence by officials in failing to protect a prisoner from an assault does not form the basis of a § 1983 claim.") (citing *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995)).

A prison official does not act with deliberate indifference to a prisoner's safety "unless the official knows of *and* disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837 (emphasis added). The Supreme Court held that a prison officials are not liable for the failure to protect a prisoner if (1) "they were unaware of an even an obvious risk to inmate health and safety"; (2) "they did not know of the underlying facts indicating a sufficiently substantial

danger"; (3) "they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent" or (4) "they knew of a substantial risk to inmate health and safety . . . [and] responded reasonably to the danger, even if the harm was not ultimately averted." *Id*. at 844-45.

The Fifth Circuit, in turn, has repeatedly held that "actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Hernandez ex rel. Hernandez v. Tex. Dept. of Protective and Regulatory Servs.*, 380 F.3d 872, 883 (5th Cir. 2004) (holding that even gross negligence does not establish deliberate indifference).

In *Parker v. Currie*, a Texas prisoner filed numerous grievances alleging that his life was in danger from other prisoners and asked to be placed in protecting housing. *See* 2008 WL 4147757, at *2-3 (E.D. Tex. Aug. 29, 2008). Prison officials conducted multiple investigations and the UCC concluded that Parker's allegations of danger could not be substantiated. *Id*. at *3. His classification file further revealed that during relevant time period for which Parker complained, nine life endangerment investigations were conducted, and he was repeatedly moved from cell to cell because he complained of having problems with his cellmates. *Id*.

Parker was allegedly assaulted by his cellmate. On summary judgment, this Court determined that Parker failed to show that the defendants were deliberately indifference to his safety for placing him inside the cell where he was assaulted—even though he complained about being the subject of attacks before the incident of which the defendants were aware. *Id*. at *7. The facts revealed that while Parker lodged complaints that his life was in danger, prison officials repeatedly investigated his complaints. *Id*. at *6. None of the investigations were substantiated; however, prison officials moved his cell assignment on numerous occasions and even transferred

15

him from unit to unit in an attempt to alleviate his concerns. *Id*. This Court further found that "[t]he fact that [Parker] was placed with a cellmate who was also suitable to be classified to this custody status is not proof of deliberate indifference." *Id*. at *8.

On appeal, the Fifth Circuit held that Parker "failed to meet the extremely high standard for deliberate indifference." *Parker v. Currie*, 359 F. App'x 488, 490 (5th Cir. 2010). The Court highlighted that each time Parker complained to prison officials that his life was in jeopardy, prison officials "dutifully investigated Parker's claim and determined it to be unsubstantiated." *Id*. Despite finding his claims unsubstantiated, the Fifth Circuit explained that prison officials nevertheless moved him from one unit to another—from one cell block to another "to try to keep him away from what he perceived to be life-threatening danger." *Id*. For Parker, the Fifth Circuit reasoned, "any assignment to a general population unit was objectionable," especially given his admission that "he made it plain to prison officials that he would keep filing complains until he was housed by himself." *Id*. The Court affirmed this Court's granting of summary judgment in favor of prison officials.

The facts in this case are similar to those in *Parker*. As in *Parker*, here, Thompson first investigated McDavid's complaint within his January 12, 2019, grievance that his life was in danger. She interviewed him on January 16, 2019, wherein he explained that his life was not presently in danger in a written statement. He noted that he was previously attacked in 2009 at a different prison unit and desired not to be housed with G-III prisoners. While he repeatedly complained that he could not be housed with G-III prisoners, Thompson explained that those prisoners may be housed together—at which point McDavid became angry and left.

Given that McDavid admitted that his life was not presently in danger and explained that he was "attacked" at a different unit ten years prior, he has neither shown that Thompson drew the

inference that he was in serious danger nor that she then disregarded a risk to his safety. McDavid omits how he wrote in his grievance prompting the interview that "this is not a LID or OPI housing issue" and that "all I'm asking is to be moved" off a G-III building, (Dkt. #107, pg. 20).

Thompson investigated his complaint mere days after he wrote his grievance—and because Thompson's investigation ultimately did not substantiate McDavid's claims is not evidence of deliberate indifference. *See Stout*, 599 F. App'x at 171 ("An official is not liable if she reasonably responded to a known substantial risk, even if the harm was ultimately not averted.") (unpublished) (internal quotations omitted). Here, even if there was a substantial risk of harm, Thompson reasonably responded to the risk by conducting an investigation which included interviewing McDavid. As in *Parker*, Thompson and prison officials acted even if harm was not averted. *See Longoria v. Texas*, 473 F.3d 586, 593 (5th Cir. 2006) ("No liability exists, however, if an official reasonably responded to a known substantial risk, even if the harm was ultimately not averted.") (internal quotations omitted).

To the extent that McDavid insists that Thompson ignored his concern regarding G-III prisoners or that the SCC overrode the transfer recommendation, such claims fail. A prisoner does not have a constitutional right to choose his custody level and does not have a protected liberty interest in his custodial classification. *Neals*, 59 F.3d at 533; *see also Humphrey v. Banks*, 777 F. App'x 767, 768 (5th Cir. 2019) (same). Similarly, a prisoner's disagreement with a classification determination is insufficient to establish a constitutional violation. *Neals*, 59 F.3d at 533 (affirming the district court's dismissal of prisoner's claim that prison officials wrongly denied his requests to be reclassified for safekeeping as frivolous). Accordingly, McDavid's complaints regarding his housing with G-III prisoners, without more, is insufficient.

Thompson's actions after the February 9, 2019, altercation belie any claim that she acted with deliberate indifference to McDavid's safety. Upon return to the Michael Unit after the hospital, Thompson interviewed McDavid. McDavid expressed his desire to be placed in safekeeping, and reiterated his previous "attacks" in 2009. He recognized that he previously wrote a statement explaining that his life was not presently in danger, but insisted that he nonetheless "felt unsafe" with G-III classified prisoners. Thompson then interviewed two other prisoners and McDavid's cellmate—and reinterviewed McDavid. After she completed her investigation, she forwarded her findings to the UCC. While the UCC recommended that McDavid be transferred, the SCC overruled that recommendation and released him to general population. The Court recognizes that McDavid disputes that Thompson interviewed him upon his return, but he offers nothing other than his conclusory statement that does not refute the competent summary judgment evidence before the Court.

Here, as in *Parker*, Thompson conducted an investigation. Her investigations—both before and after the February 2019 assault—refute the allegation that she "disregarded" a risk to McDavid's safety and disproves McDavid's claim that she failed to act. The fact that McDavid is dissatisfied with Thompson, the UCC, or the SCC's determinations is of no consequence because he has no constitutional right to choose his housing. *See Poree v. Akwitti*, 834 F. App'x 934, 935 (5th Cir. 2021) (Mem) (explaining that any argument implicating the denial of placement in safekeeping is without merit because prisoners do not have a protected liberty or property interest in custodial classification and any disagreement with a classification fails to show a constitutional violation).

McDavid's notations throughout his response, (Dkt. #107), consist of hearsay, general conclusions, and speculation—which are not competent summary judgment evidence. *See Okoye*

*v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 510 n.5 (5th Cir. 2001) ("Because these statements are hearsay, they are not competent summary judgment evidence.") (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("[e]vidence on summary judgment may be considered to the extent not based on hearsay")). McDavid failed to point to competent evidence creating a genuine issue of material fact, as even "a scintilla of evidence is not enough." *Melvin v. Karmen*, 550 F. App'x 218, 220 (5th Cir. 2013) (unpublished); *Barnes v. McCree*, 273 F. App'x 399, 399 (5th Cir. 2008) (unpublished) (explaining that "Barnes offered only a 'mere scintilla' of competent evidence and general conclusions, allegations, and speculation, which are insufficient to defeat summary judgment.").

McDavid focuses heavily on how he was "attacked" after his first interview with Thompson in January 2019; however, as explained, simply because harm was not averted does not mean that deliberate indifference occurred. *See Eugene v. Deville*, 791 F. App'x 484, 485 (5th Cir. 2020) (Mem) (explaining that a prison official may satisfy the Constitution "if they responded reasonably to the risk, even if the harm was not averted) (quoting *Farmer*, 511 U. S. at 844)). Here, McDavid failed to show that Thompson inferred that he was at substantial risk of serious harm *and* that she disregarded that risk. The summary judgment evidence reveals the opposite: Thompson investigated his claims of danger multiple times. *See Parker*, 359 F. App'x at 490 (highlighting that although Parker repeatedly complained about danger, the fact that his claims were investigated and ultimately found to be unsubstantiated negated the inference of deliberate indifference).

### 2. Qualified Immunity

Finally, Thompson is entitled to qualified immunity. The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 409 (5th Cir. 2009). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

To demonstrate the inapplicability of the qualified immunity defense, the plaintiff must satisfy a two-prong test. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The first prong is whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (citation omitted). The second is "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citations omitted). A court may consider the two-pronged inquiry in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When applying the second prong, the court examines whether "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (internal alterations and quotation marks omitted). The Fifth Circuit has observed that an official:

> does not lose qualified immunity merely because a certain right is clearly established in the abstract. It is clearly established that the government may not deny due process or inflict cruel and unusual punishments, but those abstract rules give officials little practical guidance as to the legality of particular conduct. Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be on notice that their conduct is unlawful.

*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (internal quotation marks omitted).

Here, McDavid failed to establish a constitutional violation. He therefore failed to clear the first hurdle. Moreover, even if he had alleged a constitutional violation, he failed to show that Thompson acted unreasonably. The summary judgment evidence reveals that before and after the February 2019 assault, Thompson investigated McDavid's danger claims. Given McDavid's (1) initial claim that his concerns were not "LID or OPI housing issue", (2) written statement that his life was not presently in danger, (3) his insistence not to be housed with G-III offenders, (4) previous "attacks" years prior at a different unit, and (5) multiple investigations, the Court cannot find that her actions were objectively unreasonable. She is therefore entitled to qualified immunity.

<u>RECOMMENDATION</u>

Accordingly, it is recommended that Defendant Thompson's motion for summary judgment, (Dkt. #107), be granted. The Court further recommends that Plaintiff's motion for summary judgment, (Dkt. #105), be denied and that this case be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**So ORDERED and SIGNED this 5th day of January, 2023.**

21

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE